The next case for argument is 19-1125, ProStrakan v. Actavis. ProStrakan, Inc. v. Actavis Laboratories UT, Inc. Good morning, Your Honors, may it please the Court, Gary Hood on behalf of the appellate Actavis Laboratories UT, Inc. The issue on this appeal is the proper treatment of the transitional phrase, consisting essentially of. That phrase in this particular patent suit, the 282 patent, was added late in the prosecution, a tortured prosecution that took five plus years. And that particular amendment, which came based on the examiner asking that that be done to issue the patent, set in motion the test by which the plaintiff at the district court level, ProStrakan, would have to prove infringement. And that is the reason why we're here today, because the district court, in attempting to apply the test for what is a material effect on the basic and novel properties of the invention, which is required with respect to that transitional phrase, applied a test that was incomprehensible and found infringement, despite the fact that the evidence that was presented did not address directly the material effect of an unclaimed ingredient, vinyl acetate, in the Actavis accused product. The prosecution history is in the file. This is at the appendix, page 2652, where the acrylic adhesive is the focus of that particular transitional phrase. The claims in August of 2005 did not include that phrase. They were to an adhesive patch, quote, wherein the adhesive is an acrylic adhesive containing non-acidic hydroxyl moieties. And then over the course of a good five years, we get finally to a request for continued examination, where specific amounts of monomers are added into the claims. This is after a number of rejections of the claims on both 102 and 103 grounds, and specific pieces of prior art that the examiner found to anticipate or render obvious the claims. That then results in June of 2009, in this examiner's amendment, where this phrase, consisting essentially of, is brought into the claims, Prost-Tracan agrees to allow that to come into the claims, in order to get the patent issued. And that's when the patent finally issued, in 2009. The issued claim then is to an acrylic adhesive, specifically with respect to the element that we're here to talk about, consisting essentially of, and I won't quote the claim, but a primary monomer and a functional or modifying monomer with respect to non-acidic hydroxyl moieties. So the proper legal test, we don't have a lot of cases on this, of course, it doesn't come up a lot, but the proper legal test is then for the plaintiff to prove infringement, they have to do what they normally do, and that is to prove all of the elements of the claim are present, but they have an additional burden. They also have to prove that unclaimed ingredients that are in the invention, here the acrylic adhesive, do not have a material effect. In the product, in the accused product. In the accused product, that's correct, Your Honor, on the basic and novel properties of the invention. In this case, at the district court level, the parties disputed the basic and novel properties. Can I ask you a question? Yes, Your Honor. In your brief, you also really emphasize or devote time to the court's interpretation. You're not focusing on that right now. Right now, you're focusing not on the interpretation of consisting essentially of, so much as focusing on the evidentiary question of whether there's infringement. That's correct, Your Honor. That is correct. We also, we did dispute the basic and novel properties. Here on this appeal, we're saying, based on the court's application of the material effect test, the evidence did not show, Prostercan did not carry its burden to show that the vinyl acetate, which is an unclaimed ingredient in the activist's accused product, does not have a material effect on those basic and novel properties. That's correct. There were three basic and novel properties, as our briefs show. We focused on one, and that is what the court called the increased transdermal delivery of granicitron. That's the active drug that's in the patch. We talk about that as permeation, and that's how we simplified that. It was undisputed in the district court that the activist's accused product, the acrylic adhesive, which is a commercially available acrylic adhesive, has 26.5% vinyl acetate. Over a quarter of this particular acrylic adhesive is this unclaimed component vinyl acetate. The issue then for the district court and the burden on Prostercan was to prove that 26.5% vinyl acetate in the activist and the product did not materially affect permeation. That's where we submit the district court went astray. What it did was it adopted for what is and is not a material effect, what we have argued is a nonsensical standard. This came out of Prostercan's expert on direct questioning from the district court. What he said was, quote, a material effect is a large enough effect that would project that a POSA, person of skill in the art, could make a reasonable size granicitron transdermal patch based on that transdermal permeation. That's in the appendix at pages 62, 15 to 16, and it's finding effect 111. I still don't know what that means. It seems to suggest that that would not be a material effect if a person of skill in a patch that works with granicitron, it doesn't seem to be a material effect. The court didn't cite any case law for that, relied solely on Dr. Enscore, who was the expert that made that particular statement, but then through that lens determined that based on the evidence presented by Prostercan, there was infringement. And that evidence was insufficient, simply insufficient. Basically two pieces of evidence that were presented. The first comes out of the 282 patent itself, and this is table two of the patent. This is in the appendix at page 197, and this is a table that shows the relative permeation amounts for four different acrylic adhesives. These are all what are called Durotac adhesives, DT, there's DT 4098, 2052, 2353, and then 2287. And 2287 is the adhesive that is in the accused product. And what this table shows is, with respect to those four adhesives, different permeation levels that were tested at different time intervals from three hours to 48 hours. The table, though, as the evidence also showed, based on what was also entered into evidence, the Durotac product selection guide, this is at the appendix, page 2716, tells you what's in each of these particular adhesives. This is a guide that was used by people who were formulating adhesives with respect to the different adhesives. For three of those four adhesives, they have vinyl acetate. One of those adhesives does not have vinyl acetate. The one that does not is the Durotac 2353. And it just so happens, if you look at table two in the appendix at page 197, this is directly out of the patent, that one adhesive without vinyl acetate across the board has the lowest amount of permeation. So if anything, the conclusion from this, at least based on the information presented here, is that vinyl acetate seems to be increasing permeation, if anything. Now there's different levels of permeation, depending on which of the adhesives you look at, and there's different functional groups, and the court focused on that. Whether there was any functional group, which there isn't in 4098, or whether there's a non-acidic hydroxyl, which is like 2287. Now, just to clarify, in these charts that you're referring to right now, it's the DT2287 that actually is the one that's in claim six, right? Or not claim six, but in the claims, right? Not technically, Your Honor. It's 2287 that is in the patent. It is 2287, or 2287 isn't directly called out in the patent. It's not, but we're talking about the OH group, as opposed to the carboxyl group. That is correct. Because the one you're pointing to, the 2353, has a carboxyl group. That is correct, Your Honor. That is correct, and that was the transitional phrase applies to that, what was termed in the patent, the non-acidic hydroxyl moiety. That's the OH group that's in there. The court also looked to, Prostercam presented another table, and this came directly out of the Activist ANDA. This was an Activist ANDA formulation transfer report. This is in the appendix of pages 2723 to 2724, and similar to table two of the patent, this shows relative permeations that were tested by Activists in connection with its ANDA for various commercially acceptable, or commercially available, rather, adhesives. This includes, again, 2287, but it includes some others, Durotac 2196, Durotac 2677, and Durotac 2054, and it shows, at various time points, the permeations. The point of this table, at least in context of where this came out, was to show that, for purposes of FDA approval, the Activist product was going to work similarly to the Sancuso branded product. With that being said, the evidence here, again, shows for all four of the, not the Sancuso at the top of the table, but the other four adhesives that were tested and that are reported here, all of these include vinyl acetate. Three of these include carboxylic acid groups, and only the one, the 2287, includes the non-acidic hydroxyl. The district court focused on only two of these, though, and that was the 2287 as compared to the 2196. If you look at the 2196, it just happens to be the one that has the lowest amount of permeation across the board. Again, all of these have vinyl acetate in them. But from that alone, the court concluded that the non-acidic hydroxyl is what it called the factor increasing permeation. Did not address specifically vinyl acetate. What we do know is, both in this table from the Activist and in the patent, we know the quantity of vinyl acetate only in the DT2287. There was never any evidence presented in the district court of the quantity of vinyl acetate in any of these other Durotec products. So we know Durotec, specifically with respect to certain formulations of it, either do or don't have vinyl acetate. We only know the amount for Durotec 2287. The district court disregarded that, looked simply to these tables and said, well, I see there's a difference in permeation between carboxylic acid groups and non-acidic acid groups, and I'm going to say that, based on that, despite the fact that there's differences in vinyl acetate and unknown, we had no proof or evidence of the relative amounts of vinyl acetate in these formulations that there's infringement. He relied on expert testimony in making that conclusion, right? He did, Your Honor, yes. And Prostracan presented Dr. Ensgore, who was their expert at trial. And Dr. Ensgore was the one that presented these particular pieces of evidence with respect to his conclusion, ultimately, that vinyl acetate does not have a material effect. Dr. Ensgore testified, and he was asked a number of times, did you test the product? Did you test the activist and the product? Because that's the inquiry that we have to look at for infringement. He did not. And his testimony was, well, if I tried to do what was suggested, and that is the acrylic adhesive in the activist product with vinyl acetate and without vinyl acetate to figure out if the vinyl acetate in the product is having a material effect on permeation, his testimony was, well, it wouldn't be Durotec 2287. And that's not the point. The point is, he said the vinyl acetate is nothing but a bulking agent, or I think he said it affects the bulk physical properties or something like that. Take it out or do something to show, does the vinyl acetate, particularly when you have it with this non-acidic hydroxyl moiety, as they call it, have an effect on the permeation? Is it increasing the permeation? Is it decreasing the permeation? If you look at the tables, what we can't tell is, you look at those carboxylic acid group formulations, and it looks like for all those, it's lower. Is it the presence of a carboxylic acid group with or without vinyl acetate that is causing permeation to be suppressed? We simply don't know. And Dr. Enscore didn't test for this. There was no evidence presented other than his conclusory testimony that, well, based on these tables, and the court looked at some prior art and some other things to try to fill some gaps here in the puzzle and put together the infringement puzzle, my conclusion is, Dr. Enscore says, that vinyl acetate has no material effect. And the court decided, based on this evidence, well, even though I know that there's a difference between certain of these formulations with or without vinyl acetate, and I don't know how much, I'm going to say it's those carboxylic acid groups as compared to the non-acidic hydroxyls, and therefore vinyl acetate does not have a material effect. The court effectively shifted the burden as well, Your Honors, and the court criticized activists in a number of ways for not presenting affirmative evidence that there was not, or that there was a material effect from vinyl acetate, specifically criticizing the activist expert Dr. Tan. And what the court said here, and this is at Finding of Fact 117 in the appendix at page 45, contrary to Dr. Enscore, Dr. Tan cited no documentary evidence. He testified about the same tables that Dr. Enscore did. He performed no laboratory experiments. Dr. Enscore performed no laboratory experiments. I'm not sure where that came from. And quote, provided no data that vinyl acetate is anything other than a bulking modifying monomer. Perhaps he didn't, but he testified as a formulator at the company that makes these Durotec adhesives about what it is and that it does a lot more than simply add bulk. I see I'm into my rebuttal time. Thank you. I think we've pretty much exhausted it, but will we still have some time? Good morning, Chief Judge, Your Honors. Barry Golub, Cousin O'Connor for PROSTRCON. If I could pick up on something that Mr. Hood just said. He said that the two experts looked at the same evidence. And that's what happened here. The two experts looked at the patent. They looked at the testing in the patent. They looked at the testing in activist's ANDA. And the court said, we met our burden and we showed that this testing and the activist function of vinyl acetate and what vinyl acetate is used for and how it reacts. And the court said, our witness is credible. Their witness is not credible. It's the same evidence. There's no requirement for testing. MARTEC tells us there's no requirement here for testing. The question is, did we meet our burden to show by a preponderance of evidence that vinyl acetate doesn't have a material effect on the basic ineligible properties? I don't have it in front of me. But there's that sentence from the expert that was read before, which is extremely difficult for me to understand what it even means. And yet, the district court seems to have relied on that in some way in making its factual conclusion. Can you explain what that sentence is supposed to mean? Sure. I believe you're talking about the definition of material effect. Is that what you're? First of all, what page should I be looking at? So the court in finding effect 111 at APPX 43 said, basically, that a material effect is that there's enough granacetron flux or permeation so that you could make a reasonably sized patch. That's what it was defined at. And that was based on his testimony at 6240, where he says, where he compared the adhesives of 2052 and 2353 from the patent. And those are both the ones with carboxyl groups. One had vinyl acetate and one didn't. And he said, neither one of those are acceptable. Because you could not, based on the patent and the teachings of the patent, you could not make a patch of reasonable size based on that flux. The only one you could make a patch of a reasonable size was of 2287. And that makes sense, because the patent tells you at APPX 193 that the object of the invention is to reduce the size of the patch necessary to achieve anti-emetic blood plasma levels in the drug. That's what was the invention. The prior art, as it's stated in the patent, said that there was a patch that was 100 centimeters squared. Indeed, in claim 23 of the patent, it tells you exactly what the size needs to be. We claim between 10 and 100 centimeters squared. So the definition was put there based on the information of the patent. And the court said it went unrebutted and accepted that definition. And so that's a finding of fact that the court has obviously given deference to. So that's where the definition came from. There were many other sites in the patent at Common. And what was the underlying evidence, by which I mean underlying what the experts asserted for the proposition that the, what is it, the vinyl acetate, is that what we're talking about? The vinyl acetate. The vinyl acetate didn't make a material difference in, let's say, the size of a patch that you would need to get the required, the therapeutically required amount of the medication in. Right. So there were several things that were relied upon by the expert. First, he relied upon the description at APPX 194, column 4 of the patent, which describes that vinyl acetate is a modifying monomer and it's used for bulk and tack. And that's very well known. It's part of the long history of what vinyl acetate is. And it also, at APPX 194, column 4, the patent- I'm sorry, from which the implication is it would not have a permeation reducing effect? Right. It's an inert monomer, so it doesn't affect. The whole patent is about a functional monomer is what's doing all of the ability for this flux to come out quick enough to make a reasonably sized patch. The vinyl acetate is inert, it's non-reactive. The teaching in the patent is that. And it teaches you that it should be between 10% and 40%, which is exactly where it is. So when we look at this, Dr. Enscore looked at the patent- Were you also going to refer to column 4, lines 38 to 44 or so, where it talks about how permeation enhancers are generally not required in the present invention? Yes. In this case, because the flux was so good with the hydroxyl functional group, there was no need for a permeation enhancer. As the court may be aware, when you're having a transdermal delivery, sometimes you need to use a permeation enhancer because you can't get enough flux out and there are a lot of downsides with permeation enhancers. It gets rashes on your skin and things like that. So one of the things that the inventors found was that the flux with the hydroxyl group was sufficient to make a reasonable size, even though the prior art taught away from it, and you didn't need a permeation enhancer. But Dr. Enscore relied on that definition and his knowledge. He's a very well-known formulator of transdermal products. And I believe he testified that he did the nicoderm patch. And so he testified that vinyl acetate is very well-known in the industry as this. He confirmed that through the patent. Then he looked at the in vitro testing in the patent at APPX 196 and 197. And as Mr. Hood said earlier, there were four different adhesives tested. And of the four different adhesives tested, notably, if you look at Table 1 at APPX 196, you see which functional group they have. But you also see whether they have vinyl acetate or not. And you'll see that what Dr. Enscore did is he compared, he looked at all of them. And he said, well, when you look at the two that have the carboxyl group with one having vinyl acetate and one not, that would be 2052 and 2053. Again, he said you look at three and six hours. Because when you look at the hydroxyl 2287, most of the drug is gone at 12 hours. So the others would be just catching up. And that's what the patent teaches you as well in Column 8. But when you look at those two, neither one of them are acceptable because you can't make a reasonably sized patch out of that. So with one having vinyl acetate and the other one not, clearly, the vinyl acetate is not having a material effect on the adhesive. And then when you look at 2287, you can see that you can make a reasonably sized patch from the hydroxyl group. And then what the court said is that we had met our burden. But then the court looked, as we directed the court through expert testimony, to activists' own testing data. And as this court is well aware, ANDA applicants test their product frequently. So when you look at the testing that was done by activists at 2724, you can see that they tested products here. They tested the one they were going to use, the accused product 2287 in the bottom chart in Table 2. They also tested three other products that were 2196, 2677, and 2054. All of those had carboxyl groups, and all of those had vinyl acetate. And as Dr. Enscore testified, none of them are any good. You could not make a reasonably sized patch from any of them. And then when you look at 2287, which had the hydroxyl group and vinyl acetate, it was virtually indistinguishable from the branded product. And that makes sense, because they copied the branded product. It's an exact duplicate. So from that, the court concluded that that evidence confirms what was in the testing in the patent, which showed that it was the functional group making the difference. And vinyl acetate did not have a material effect on the basic and novel property of flux. I will touch just a minute on the testing. So the court found that the testing was not required. And as this court knows, Martek has said that there's no absolute rule that testing is not required. That testing is required, I'm sorry. The problem here is that the question is not, is testing required or is testing not required? The question is, did we meet our burden? And the court found that the evidence we put forth, we met our burden. I believe that's at APPX 44 to 53. We have met our burden. The interesting thing is that their expert, Dr. Tan, relied on the same evidence to say we didn't meet our burden. And the briefs of activists say, well, it would be just as logical to go with Dr. Tan's version than it would be to go with Dr. Enskor's version. The problem with that is the judge made that fact finding. The judge found that Dr. Tan was not credible. He gave it little to no weight. And he said he was going with the evidence presented by Dr. Enskor, which was that these tests, the testing and the disclosure and the patent about the known properties of vinyl acetate, as well as what the prior art taught about vinyl acetate, we met our burden that vinyl acetate does not have a material effect on the basic and novel property of increased penetration, flux, whatever you want to call it. I'll just, I don't know if Mr. Hood has waived their argument with respect to the claim construction, because if the court knows in their brief, they said that the consisting essentially of means that it should be the basic and novel properties of the subpart of the adhesive and not of the invention as a whole. I am presuming that they are, since they didn't talk about it at all, that they're either not going to press that or... Well, I wouldn't necessarily make that assumption. Okay. We've got 15 minutes here and they pick and choose what they think maybe are the stronger arguments, but I'm not sure. Okay. That is a waiver. Thank you, Your Honor. They spent considerable time on the briefing. Okay. So I would say that under PPG and AK Steel, they tell us that it's the invention as a whole you have to look for, because that makes sense, because you're looking at what are the basic and novel properties of the invention over the prior art. The adhesive, as they say, is the prior. It's in the prior art. It's not the new thing. I think those cases, I don't think AK Steel did it. The issue wasn't presented as it's presented here, right? Differentiating between whether you look at the invention with a particular limitation. I mean, you're right. In AK Steel, we conclude it. We compared it to the invention, but I don't recall that there was an argument made or a dispute in that case. I don't think there was either, Your Honor, but I think— So we didn't really decide that dispute, even though parties seemed to agree we were looking at the invention. Right. The law said you look at the invention as a whole, and then the court did an analysis at the markment of what is that invention and what are the basic and novel properties. That's exactly what was done here. This court followed AK Steel, looked at consisting essentially of, in a subpart of the claim, they looked at the invention as a whole, which was the basic and novel properties related to wetting here. Even though the consisting essentially of said aluminum, that wasn't where the court was looking in terms of what were the basic and novel properties. They were looking at the invention as a whole, and that's what this court should do as well, because it would not make sense to use a piece of something that was old as looking at the basic and novel properties. So I see I have just over a minute. I'll touch very briefly on invalidity. It's a little odd simply because your friend did not raise or even cover, raise these things. Now you're, I guess, reopening his ability to respond to these new arguments that you're making. I won't raise validity. If the court has no other questions, I'll actually stop. Thank you. Thank you, Your Honor. I'll keep this short. I just want to be clear. You have not waived. Was I correct in presuming that you had not waived? You are correct, Your Honor. We have not. But we did spend our time on where we think this case really turns, and that is the infringement issue. To your question earlier, Judge Stoll, the claim construction issue at the end of the day I don't think really matters. The question here is the evidence presented at trial with respect to infringement. What we did not have is evidence of the actual effect of the 26.5% vinyl acetate in the activist's hand of product. And the case, this court's case, Kim v. Conagher, we've cited this. It's been cited and addressed from 2006. It's really the case that tells us where we're at. This was not a credit issue, Your Honor. Would both parties have been able to conduct a test? Or was that somehow uniquely in their... I'll just stop at that question. No, I believe the test is capable of being done, Your Honor. If that's your question, that's correct. That's correct. Prostercan's burden to show it, they didn't do it. Dr. Ensford didn't explain why he didn't do it. Just didn't do it. It didn't present that evidence. So our position as in this court's... Sometimes these arguments are successful and sometimes they're not when there's a kind of game of chicken going on. Correct, Your Honor. What happens in the absence of a particular test. Understood. Understood. And I think what the Kim v. Conagher case tells us is that conclusory testimony, which this court characterized as Dr. Kim's expert testimony in that case about material effect of additional components in the accused product, because it doesn't test the accused product and the effect of those components, that's conclusory testimony. It doesn't satisfy the burden. So that's why our position is that burden never shifted. And this isn't about Dr. Tan versus Dr. Ensford. One thing that counsel also said here too was that there was a... The material effect test, I believe, Your Honor, had asked about that and that it went unrebutted. That did not exactly go unrebutted. That's what the court said. What Dr. Tan did, however, he testified about what he believed a material effect would be. And this is in the appendix at pages 6499 to 6500. This is not a quote, but he basically said a material effect is a change to the physical and chemical structure of the adhesive that results in a change to the physical and chemical properties of the patch. And again, he's a formulator that's formulating these Durotac adhesives. And he's saying, look, if you're going to add something into this that is going to change the physical and chemical properties of the patch, i.e. the permeation levels, you're going to have a material effect. Dr. Ensford asked by the district court, can you quantify what would be sufficient to be a material effect? Five percent? Ten percent? He didn't answer that question. He came back with the standard that it's a large enough effect that would project that a poster could make a reasonable size patch. Simply not here. Again, at the end of the day, if you look at the tables, table two from the patent, and you look at the ANDA transfer report, we don't have quantification of vinyl acetate. Thank you very much. Thank you. We thank both sides in the consistent manner.